# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

THE CITY OF DETROIT,

     Plaintiff,                           Case No.

v.

UNITED STATES DEPARTMENT
OF COMMERCE, and GINA M.
RAIMONDO, in her official capacity
as Secretary of Commerce; and
UNITED STATES CENSUS
BUREAU, an agency within the
United States Department of
Commerce, and ROBERT L.
SANTOS, in his official capacity as
Director of the United States Census
Bureau,

     Defendants.

---

| CITY OF DETROIT | FINK BRESSACK |
|---|---|
| LAW DEPARTMENT | David H. Fink (P28235) |
| Conrad L. Mallett, Jr. (P30806) | Nathan J. Fink (P75185) |
| Charles N. Raimi (P29746) | Philip D.W. Miller (P85277) |
| Coleman A. Young Municipal Center | 645 Griswold Street, Suite 1717 |
| 2 Woodward Avenue, Suite 500 | Detroit, Michigan 48226 |
| Detroit, Michigan 48226 | (313) 387-3300 |
| (313) 224-4550 | *Counsel for Plaintiff* |

---

## **COMPLAINT**

     NOW COMES Plaintiff, by and through its attorneys, Fink Bressack and the

City of Detroit Law Department, and for its Complaint, states as follows:

## **INTRODUCTION**

1.      Tens of thousands of Detroiters were uncounted in the Census Bureau's 2021 estimate of the City's population.

2.      By the Bureau's own admission, it has undercounted the nation's Black population by 3.30% and the Hispanic population by 4.99%, while overcounting the non-Hispanic White population by 1.64%.

3.      In Detroit, which has a 77.1% Black population and a 7.7% Hispanic population, *based upon the Bureau's own statistics, over 20,000 Detroiters were uncounted* in the 2020 Census.

4.      Yet, when the Bureau estimated Detroit's population as of July 1, 2021, rather than correcting the racially-biased undercount it had already admitted, the Bureau *reduced Detroit's population by an additional 7,150 people* compared to the April 1, 2020 census count.

5.      In fact, the best available evidence—including Postal Service records, active water and electric utilities accounts, new residential construction projects, and occupancy records from the Detroit Land Bank Authority—proves what city residents, visitors, and businesses already know: *Detroit gained population during that time*.

6.      Notwithstanding its own acknowledgement of a racially-biased undercount, the Census Bureau refuses to look at the evidence and correct its error.

7.      Historically, Census Bureau regulations allowed municipalities to submit evidence to correct inaccuracies in the annual population estimates.

8.      On January 9, 2020, the Department of Commerce and Census Bureau promulgated a rule temporarily suspending this "Population Estimates Challenge Program" to accommodate taking the 2020 Census. The rule stated "[t]he Population Estimates Challenge Program *will resume in 2022* after the Census Bureau concludes its responsibilities in the conduct of the decennial census."

9.      But now, without notice or opportunity for public comment, the Bureau has adopted and applied an unpromulgated rule by simply decreeing on its website that it will not consider evidence about miscounts in the 2021 estimates, and that "[t]he program is expected to resume in 2023."

10.     The Bureau has denied Detroit's request to submit evidence concerning the accuracy of the 2021 estimate and has even refused to disclose to the City the secret formula used to calculate the Bureau's distorted population estimate.

11.     Absent judicial intervention, Detroit is without recourse to correct this racially-biased 2021 population undercount because the Commerce Department and the Census Bureau refuse to abide by their own promulgated rule.

12.     The Bureau's failure to consider evidence of its inaccurate 2021 estimate costs the City and its residents millions of dollars of funding to which they are entitled while threatening the City's historic turnaround by advancing the false

narrative that Detroit is losing population.

13.    The Census Bureau's refusal to consider evidence that its 2021 estimate of Detroit's population is wrong—in direct violation of its own administrative rule—perpetuates racial inequality, and disproportionately harms Detroit and its communities of color.[1]

## PARTIES

14.    Plaintiff City of Detroit ("Detroit" or the "City") is a municipal subdivision of the State of Michigan. Detroit is the largest city in Michigan, with a population of over 639,111. More than 77% of Detroit's residents identify as Black or African American, giving the City the highest percentage of Black residents among the 50 largest cities in the United States.

15.    Defendant United States Department of Commerce is an executive department of the federal government with jurisdiction over the Census Bureau. 13 U.S.C. § 2.

---

[1] Separate from, and in addition to, the Bureau's own admission of a racially-biased undercount, there is much objective evidence that the 2020 Census dramatically undercounted the population of Detroit. The City is challenging the 2020 Census undercount through the Bureau's available (though insufficient) administrative procedures, including a Count Question Resolution ("CQR") operation challenge and forthcoming Post-Census Group Quarters Review ("PCGQR") submission. Given those potential administrative remedies, a challenge to the 2020 Census undercount is not yet ripe for litigation, and this Complaint is directed to the 2021 population estimate, for which all available administrative remedies have been exhausted.

16.     Defendant Gina M. Raimondo is the Secretary of Commerce and is sued in her official capacity. In addition to Congress' delegation of authority for conducting the decennial census to the Secretary of Commerce, the Secretary is required to produce reliable annual population estimates for each local unit of government with a population of fifty thousand or more for every year between each decennial census. 13 U.S.C. §§ 141(a), 181(a).

17.     Defendant United States Census Bureau (the "Census Bureau" or the "Bureau") is an agency within, and under the jurisdiction of, the Department of Commerce. 13 U.S.C. § 2.

18.     Defendant Robert L. Santos is the Director of the Census Bureau and is sued in his official capacity.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346(a)(2), and 1361.

20.     The declaratory and injunctive relief sought is authorized under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1). A substantial part of the events giving rise to the claims in this matter occurred in this judicial district. Defendants are United States agencies and employees of United States agencies who are being sued solely in their official capacities.

## **GENERAL ALLEGATIONS**

### **The Census Bureau Admits that it Undercounts Detroit's Minority Population**

22.    In March 2022, the Census Bureau released results from its Post-Enumeration Survey ("PES") and Demographic Analysis Estimates ("DA") about the quality of the 2020 Census count.[2]

23.    Both the PES and DA estimate whether certain groups were undercounted or overcounted. According to the Census Bureau, "[w]hile the two approaches are different, the results show the PES and DA mostly align, providing a more inclusive picture of who was counted in the 2020 Census."

24.    The results show that the 2020 Census "undercounted the Black or African American population, the American Indian or Alaska Native population living on a reservation, the Hispanic or Latino population, and people who reported being of Some Other Race."

25.    Specifically, PES data show that in the 2020 Census:

- The Black or African American alone or in combination population had a statistically significant undercount rate of 3.30%.

- The Hispanic or Latino population had a statistically significant undercount rate of 4.99%.

- The non-Hispanic White alone population had a statistically significant

---

[2] See https://www.census.gov/newsroom/press-releases/2022/2020-census-estimates-of-undercount-and-overcount.html

overcount rate of 1.64%.

26.     When the results of the Post-Enumeration Survey were released to the public, Census Director Santos acknowledged: "***the 2020 Census undercounted many of the same population groups that we have historically undercounted***" (emphasis added).

27.     Based on PES and DA data, it is possible to estimate the scale of the undercount of Detroit's population using the Census Bureau's own measures.

28.     The Bureau estimates that 77.1% of Detroit's population is Black or African American and that 7.7% of Detroiters are Hispanic or Latino.[3]

29.     Applying the PES finding that the 2020 Census failed to count 3.3 of every 100 African Americans and 4.99 of every 100 Hispanics or Latinos to the Bureau's count of Detroit's population in 2020, by the Bureau's own measure, even factoring in the overcount of non-Hispanic Whites in Detroit, the census missed more than 20,000 Detroiters.

30.     Yet in May 2022—two months after publicly confirming a racially-biased undercount—the Bureau released its estimate of Detroit's population as of July 1, 2021, which not only failed to correct for the admitted undercount of

---

[3] See
https://www.census.gov/quickfacts/fact/table/detroitcitymichigan,MI/PST045221

Detroit's communities of color, but claimed a further decline of 7,150 people.[4]

31.     Because the Census Bureau refuses to disclose the specific components used to derive its population estimate, Plaintiff must infer the ways in which the Bureau perpetuates the verified and historically targeted undercount of Detroit's Black and Hispanic population.

32.     On information and belief, one factor that contributed to the flawed 2021 estimate is the Bureau's imposition of an ill-conceived "county cap" rule, which artificially limits the population estimates of all subcounty areas within a given county and prevents the Bureau from correcting the admitted undercount of the Black and Hispanic population of Detroit.

33.     Under the county cap rule, if the total estimated population of subcounty areas (for example, cities, towns, and villages) within a given county exceeds the county-level estimate (calculated using a different methodology), the Bureau reduces each subcounty-area population estimate to fit under the "county

---

[4] The Census Bureau produces annual estimates of state, county, and municipal populations as of July 1 of a given year. So the Bureau's 2021 population estimate for Detroit—632,464—is its estimate of the City's population as of July 1, 2021. Annual population estimates for cities are typically released in the year following the year for which the population is estimated. Detroit's 2021 population estimate was released by the Bureau in May 2022. The decennial census counts the population as of April 1 for each year ending in zero. So Detroit's 2020 Census count—639,111—is the Bureau's count of the population of the City as of April 1, 2020.

cap."[5] The county cap is apparently applied regardless of any known and admitted undercount.

34.     On information and belief, among other factors, the Bureau accounts for the age of a city's housing stock in estimating its population. It applies a "housing unit loss" rate that reduces the estimate for total housing units in a city (which, in turn, reduces the population estimate) based on the age of residential housing units.[6] Apparently this factor is applied with no consideration of the Detroit Land Bank Authority's work to return thousands of older housing units to active residential use. This methodology results in a disparate impact on Detroit, a city which has a disproportionately high percentage of pre-1940 housing units, and its minority communities. The Census Bureau statistically erases these older homes, which house many of Detroit's Black and Hispanic residents, further perpetuating the racially-biased estimate of the City's population.

35.     While the Bureau has disclosed some general information about methodology for its population estimates, Plaintiff cannot fully understand the derivation of the 2021 population estimate because, as described more fully below,

---

[5] See the Census Bureau's "Methodology for the Subcounty Total Resident Population Estimates (Vintage 2021): April 1, 2020 to July 1, 2021," attached as Exhibit A.

[6] See the Census Bureau's "Methodology for State and County Total Housing Unit Estimates (Vintage 2021): April 1, 2020 to July 1, 2021," attached as Exhibit B.

the Bureau refuses to disclose the formula or data used.

36.     Despite the well-documented historical and systemic undercounts of Black and Hispanic populations[7]—*and the Bureau's own admission that it undercounts those communities*—the 2021 population estimate for Detroit exacerbates this avoidable error and compounds the racial bias in the 2020 decennial census.

### Contrary to the Bureau's Racially-Biased Estimate, Detroit's Population Grew from April 1, 2020 to July 1, 2021

37.     Any objective observer of Detroit knows—contrary to the Census Bureau's claim—Detroit's population increased from April 1, 2020 ("Census Day") to July 1, 2021 (the date of the Bureau's annual population estimate for Detroit).

38.     Even to the casual observer, the growth of Detroit's population is demonstrated by no fewer than fourteen large-scale residential projects completed in the City during this time, including the 56-unit Peterboro Arms at 26 Peterboro Street, which opened in May 2020; the 147-unit Press/321 at 321 W. Lafayette Boulevard, which opened in September 2020; the 110-unit Gabriel Houze

---

[7] Populations that historically have been undercounted include persons of color, young children, renters, and low-income households. See Alex Jones Small and Spencer Wagner, "Census 2020: How to Count Hard-to-Count Communities," *National League of Cities*, May 3, 2019. Available at https://www.nlc.org/article/2019/05/03/census-2020-how-to-count-hard-to-count-communities/

apartments at 305 Michigan Avenue, which opened in February 2021; and the 287-unit City Club Apartments at 313 Park Avenue, which opened in June 2021. Beyond these examples, the data uniformly speak to the growth of the City's population from April 1, 2020 to July 1, 2021, the Census Bureau's flawed estimate notwithstanding.

### *United States Postal Service Records Confirm a Population Increase*

39.　United States Postal Service ("USPS" or "Postal Service") records show that there was a net increase of 4,475 residential addresses in service in Detroit from April 1, 2020 to July 1, 2021.

40.　The Postal Service provides aggregate counts of residential addresses collected by postal workers to the Department of Housing and Urban Development ("HUD") on a quarterly basis. According to HUD, "[t]he potential power of these data is that they represent the universe of all addresses in the United States and are updated every three months."

41.　The USPS aggregated data report the total count of residential addresses, and the total count of vacant residential addresses.

42.　Based on the USPS data, the total count of residential addresses in service in Detroit as of July 1, 2021 was 4,475 greater than the corresponding figure for April 1, 2020.

43.　Using the 2020 Census' own persons-per-occupied unit figure for

Detroit of 2.47,[8] an increase of 4,475 in-service residential addresses indicates a population expansion in the City of Detroit of at least 11,053 people between April 1, 2020 and July 1, 2021.

### *Water and Sewerage Department Records Confirm a Population Increase*

44.     The Detroit Water and Sewerage Department ("DWSD") reported a net increase of 6,964 active residential water accounts in the City between April 1, 2020 and July 1, 2021.

45.     DWSD compiles data on water accounts for classes of customers including commercial, industrial, municipal, and residential. A single residential water account may serve between one and four units in a multi-unit building. Any account serving more than four units is classified as commercial, so the figure for residential accounts substantially understates the number of residential units being served both because (1) the residential total excludes any account serving more than four units, such as large apartment or condominium buildings, and (2) multi-unit residential buildings (such as duplexes) with four or fewer units are recorded as one account.

46.     While the actual number of residential units served is likely greater,

---

[8] This figure is calculated by (1) taking the population of Detroit as enumerated in the 2020 Census minus the population living in group quarters, then (2) dividing by the number of occupied housing units in Detroit enumerated in the 2020 Census.

there was a net increase of 6,964 residential accounts in Detroit during this period. Applying the Census Bureau's persons-per-occupied unit figure for Detroit of 2.47 and conservatively assuming just one unit per account, these data show an increase in the City's population of at least 17,201 from April 1, 2020 to July 1, 2021.

### *Detroit Land Bank Authority Records Confirm a Population Increase*

47.     Data collected by the Detroit Land Bank Authority ("DLBA") show that between April 1, 2020 and July 1, 2021, 1,583 previously vacant houses in Detroit became occupied by homeowners who had purchased through DLBA programs.

48.     DLBA uses a variety of sales programs to support homeownership and land purchases in Detroit. Each month, the land bank sells hundreds of structures to purchasers charged with rehabilitating the structure to occupiable condition. The land bank sells these homes pursuant to purchase agreements that mandate the rehabilitation and re-occupancy of each structure sold. Land bank staff monitor the rehabilitation process, preserving the right to reconvey a home if the purchaser does not fulfill their obligation to rehabilitate it. To release this reconveyance right, the land bank requires an inspection of the home to certify all compliance requirements have been met. Compliance is achieved by a homeowner's rehabilitating a property and occupying the home.

49.     DLBA's data show that compliance was achieved for 1,583 residential

units in Detroit between April 1, 2020 and July 1, 2021.

50.     Applying the Bureau's 2.47 average person-per-occupied household figure, *considering DLBA compliance data alone*, there was an increase of at least 3,910 people in previously-vacant homes purchased from DLBA in this period.

### *DTE Energy Service Accounts Confirm a Population Increase*

51.     Data from Detroit's electricity provider, DTE Energy, show that from April 1, 2020 to July 1, 2021 there was a net increase of 7,544 active residential service households in Detroit.

52.     "Active residential service households" in the DTE data reflect separate residential billing customers.

53.     While the actual number of residential units served is likely greater, based solely on the number of active residential service households, and applying the Census Bureau's persons-per-occupied unit figure of 2.47 (conservatively assuming just one unit per account), these data reflect an increase in the City's population of at least 18,634 residents from April 1, 2020 to July 1, 2021.

### In Violation of its own Rule, the Bureau Refuses to Countenance that its 2021 Estimate is Wrong

54.     During regular operations, the Census Bureau offers an opportunity for governmental units to challenge their official estimates through the Population Estimates Challenge Program. Under this program, a governmental unit may challenge its population estimate by submitting additional data to the Census Bureau

14

for evaluation.[9]

55.     On January 9, 2020, the Commerce Department and Census Bureau published a notification of final rulemaking in the Federal Register temporarily suspending the Population Estimates Challenge Program.[10]

56.     The January 9, 2020 Federal Register Notice stated that the program would be temporarily suspended "during the decennial census year (2020) and 2021 to accommodate the taking of the 2020 Census." The Notice explains: "[t]he Census Bureau will not accept challenges to the 2019 population estimates, to be released in May 2020, because of conflicts with the Census Bureau's Population Division staff's work to support the review and evaluation of the 2020 Decennial Census."

57.     The Notice continues: "[f]or these reasons the Census Bureau will suspend the Population Estimates Challenge for the decennial year (2020) and 2021. The Population Estimates Challenge program was suspended during 2010 and 2011 to accommodate the taking of the 2010 census."

58.     The Notice then concludes:

> The Population Estimates Challenge Program **will resume in 2022** after the Census Bureau concludes its responsibilities in the conduct of the

---

[9] The Commerce Department's and Census Bureau's "Procedure for Challenging Population Estimates" is codified at 15 CFR part 90. A complete copy of those regulations is attached as Exhibit C.

[10] A complete copy of the January 9, 2020 Federal Register Notice is attached as Exhibit D.

decennial census . . . . At that time, states, counties, and other units of general-purpose government may initiate challenges to population estimates under the procedures set forth in 15 CFR part 90. ***The Census Bureau would accept challenges beginning with the 2021 population estimates.*** The 2021 population estimates will be based upon the 2020 Census counts and are scheduled for release in 2022 (emphasis added).

59.     Notwithstanding promulgation of this rule, the Census Bureau—without notice or opportunity for public comment—unilaterally decreed that it would *not* restart the program in 2022. The Bureau simply posted a statement on its website that: "A Federal Register Notice announcing the resumption of the program will be posted in 2022. The program is expected to resume in 2023."[11]

60.     Relying on the rule promulgated on January 9, 2020, which stated that the program "will resume in 2022" to "accept challenges beginning with the 2021 population estimates," the City took steps to submit evidence regarding the inaccuracy of the 2021 estimate.

61.     On August 4, 2022, Detroit Mayor Michael E. Duggan formally requested the "derivation sheet containing the components used to create the population estimate," which is the first step in submitting a challenge.[12]

62.     Later that day, the Census Bureau's Assistant Division Chief for

---

[11] See https://www.census.gov/programs-surveys/popest/about/challenge-program.html

[12] A copy of Mayor Duggan's correspondence to the Census Bureau is attached as Exhibit E.

Estimates and Projections rejected the City's request. In her email response, she stated:

> . . . [W]e cannot honor the request at this time. The Population Estimates Challenge Program was suspended in January 2020, as is a usual practice surrounding the [] decennial census year, and the resumption of the program has not taken effect yet. Presently, we are working to prepare the Federal Register Notice that will reinstate the program. We expect it to be available later this year, which will enable us to accept challenges to our July 1, 2022 estimates.

63.    Thus the Bureau has cast aside its promulgated rule and unilaterally adopted a new unpromulgated rule, eliminating the City's right to challenge the 2021 population estimate.

64.    The Census Bureau is using this unpromulgated rule to prevent Detroit from seeking any administrative relief from the racially disparate undercount of its population in the Bureau's 2021 estimate—an undercount that Director Santos has openly admitted.

### If the City were Allowed to Challenge the 2021 Population Estimate, the Census Bureau's Existing Rules are Too Narrow to Provide Complete Relief

65.    The current rules governing the Population Estimates Challenge Program, promulgated following the 2010 Census and codified at 15 CFR part 90, are so narrowly written that they prevent a fair evaluation and real adjustment to an incorrect estimate, even when a challenge is backed by conclusive evidence.

66.    Under the current rules, Detroit is not permitted to present evidence challenging the population or housing unit "base" used for the annual estimates, even

when, as here, *the Bureau admits that it undercounted tens of thousands of Black and Hispanic Detroiters.*

67.     As part of any challenge to the 2021 population estimate, the City must be permitted to present evidence regarding the accuracy of the "base" population and housing unit counts, including with respect to housing vacancy rates and person-per-household figures.

68.     The Bureau's refusal to consider relevant evidence regarding the population and housing count "base," which drives the annual population estimates, constitutes an arbitrary and capricious act that is without a reasonable basis.

69.     The Bureau's "county cap" rule also irrationally restricts adjustments to a city's population and precludes meaningful relief. Compounding the problem, the Bureau has, but does not publish, data that would show how much the county cap rule distorts the City's population estimate.

70.     The county cap rule has a disproportionate and discriminatory impact on Detroit's Black and Hispanic residents because no matter how much compelling evidence the City amasses showing that its population grew, any increase would be offset in the event that (as is the case here) Wayne County records suggest a decline in the overall county population, even if that decline actually occurred among less racially diverse areas outside of Detroit.

71.     When, as here, a city presents clear and convincing evidence that its

population is miscounted in an annual estimate, the Bureau's refusal to account for that evidence because of an artificial county cap makes the right to challenge illusory and constitutes an arbitrary and capricious act that is without a reasonable basis.

72.     Finally, under the current rules, Detroit is not permitted to present evidence addressing all of the components of population change that affect its annual population estimate, such as evidence of births, deaths, migration, or other high quality administrative data that are relevant to calculating the population of the City.[13]

73.     The Bureau's refusal to consider all evidence—evidence that is directly relevant to its mandate to "annually produce and publish for each State, county, and local unit of general purpose government which has a population of fifty thousand or more, current data on total population and population characteristics" (13 U.S.C. § 181(a))—constitutes an arbitrary and capricious act that is without a reasonable basis.

## The City Has Been Significantly Harmed

74.     The impact of the 2021 population estimate's undercount of Detroit is

---

[13] Such administrative data should include data from utilities providers; local property tax records; certificates of occupancy; inspection data; building footprint files; emergency services records; school enrollment records; property sales data; Postal Service Delivery Point Validation data; and all other reliable data sources, including work product of academic and research studies.

severe. Since 2010, the City of Detroit and its residents have received more than $3.5 billion annually in federal funding tied directly to the most recent census figures. Private investment in the City is also affected; incorrect annual population estimates hinder Detroit's growth by painting a misleading picture that people are leaving the City.

75.    According to the Commerce Department and the Census Bureau, "132 programs used Census Bureau data to distribute more than $675 billion in funds during fiscal year 2015."[14]

76.    Annual population estimates are used as controls for census programs such as the American Community Survey ("ACS") and other federal surveys that are directly tied to allocation formulas or eligibility criteria for programs that provide funding to the City and its residents.

77.    As Thomas Mesenbourg, then-Acting Director of the Census Bureau explained in testimony before the House Committee on Oversight and Government Reform:

> The population estimates are used in many formulas to allocate funding. They are also used in the production of the final American Community Survey estimates released to the public. Thus the quality of the official

---

[14] See "Uses of Census Bureau Data in Federal Funds Distribution," U.S. Department of Commerce Economics and Statistics Administration, U.S. Census Bureau, September 2017. Available at https://www2.census.gov/programs-surveys/decennial/2020/program-management/working-papers/Uses-of-Census-Bureau-Data-in-Federal-Funds-Distribution.pdf

population estimates and the American Community Survey are inextricably linked to the accuracy of the decennial census. Federal agencies that administer grants and other Federal funds allocation programs typically use a mix of the decennial census, population estimates, and information from the American Community Survey.[15]

78.     The City receives and is directly impacted by federal funding tied to the annual estimates of population and housing units through many different programs:

- The City benefits from millions of dollars allocated annually through the Supplemental Nutrition Program for Women, Infants, and Children based on annual population estimates and ACS data.

- The City receives millions of dollars annually through HUD's HOME Investment Partnerships Program based on ACS data.

- Funding directed to the City through the federal government's Emergency Solutions Grants program is negatively affected by the reported population loss in the Bureau's annual population estimate.

- Community Development Block Grant funding, which takes into account the City's pre-1940 housing stock, is negatively affected by the erroneous and racially-biased undercount of Detroit's residential housing units in the most recent annual estimate.

- Detroiters benefit from Medicaid, Head Start, transit programs, Title 1 grants to local education agencies, and myriad other programs, funding for which is allocated, in whole or in part, on annual population estimates.

79.     The City and its residents are harmed by the loss of federal funding

---

[15] Hearing before the Subcommittee on Information Policy, Census, and National Archives, One Hundred Eleventh Congress, Serial No. 111-23, available at https://www.govinfo.gov/content/pkg/CHRG-111hhrg53869/html/CHRG-111hhrg53869.htm

caused by the 2021 population estimate's undercount of Detroit's population and housing units.

80.    The City and its residents are harmed by the Bureau's unpromulgated rule preventing the City from presenting evidence to correct the 2021 population estimate.

81.    The City and its residents face further harm because the Census Bureau's 2021 population estimate's undercount creates a barrier to the City's redevelopment by delivering the false message that people are leaving Detroit, when, in fact, thousands of people are moving in.

82.    The Census Bureau admits that annual population estimates affect private investment in communities, explaining the impact of census data on business decision-making in an October 2019 report: "[b]usinesses use population statistics to help decide where to add jobs or open new stores, offices or other businesses in communities across the country."[16]

83.    Based on the 2021 population estimate's racially-biased undercount of Detroit, the City and its residents will be short-changed millions of federal dollars, while the false story that Detroit is losing population discourages private investment

---

[16] "Yes, Data Can Make or Break a Business," Census Bureau Publication, October 19, 2019, available at https://www.census.gov/library/stories/2019/10/can-census-bureau-data-drive-business-growth-job-creation.html

and threatens to slow the momentum of the City's growth.

## FIRST CAUSE OF ACTION
## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
## 5 U.S.C. § 706(2)(D)

84.     The preceding paragraphs are repeated and realleged as if fully set forth herein.

85.     Pursuant to 5 U.S.C. § 706(2)(D), this Court shall hold unlawful and set aside agency actions accomplished "without observance of procedure required by law."

86.     On or before February 2, 2022, the Census Bureau, without providing notice or opportunity for public comment, stated on its website that the Population Estimates Challenge Program "is expected to resume in 2023."[17]

87.     This statement constitutes a rule under the Administrative Procedure Act, which defines "rule" as:

> the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . . 5 U.S.C. § 551(4).

---

[17] See https://www.census.gov/programs-surveys/popest/about/challenge-program.html

88.    This unpromulgated rule purports to supersede, and is in contravention of, the January 9, 2020 promulgated rule stating that the "Population Estimates Challenge Program will resume in 2022 . . . ."

89.    5 U.S.C. § 553(b) requires that, when an agency promulgates a rule, "[g]eneral notice of proposed rule making shall be published in the Federal Register."

90.    5 U.S.C. § 553(c) requires that, after public notice regarding a proposed rule is made, "the agency shall give interested persons an opportunity to participate in the rule making through the submission of written data, views, or arguments . . ."

91.    Pursuant to 13 U.S.C. § 181(a), the Census Bureau is required, to the extent feasible, to create and publish annually current data on total population and population characteristics for each state, county and local unit of government with a population of fifty thousand or more.

92.    In enacting 13 U.S.C. § 141(e)(1), Congress expressed its intent that census data be collected to ensure the accurate distribution of federal funding to local units of government.

93.    The City of Detroit is a unit of local government with a population of fifty thousand or more.

94.    The 2021 population estimate for the City of Detroit substantially undercounts the population of the City.

95.   To ensure the accuracy of population estimates required by 13 U.S.C. § 181(a), the Census Bureau created the Population Estimates Challenge Program, codified at 15 C.F.R. part 90.

96.   As stated in 15 C.F.R. § 90.2:

> It is the policy of the Census Bureau to provide the most accurate population estimates possible given the constraints of time, money, and available statistical techniques. It is also the policy of the Census Bureau to provide governmental units the opportunity to seek a review and provide additional data to these estimates and to present evidence relating to the accuracy of the estimates.

97.   The City of Detroit has an interest in the accuracy of annual population estimates published by the Census Bureau, which Congress has protected through the enactment of 13 U.S.C §§ 141 and 181.

98.   The City of Detroit has been, and will continue to be, harmed by the inaccurate 2021 population estimate through the loss of federal funds to which it and its residents are entitled and by the adverse impact of the population undercount on the City's burgeoning economic growth.

99.   Accordingly, this Court should hold unlawful and set aside the Bureau's unpromulgated rule delaying the reinstatement of the Population Estimates Challenge Program until 2023.

## SECOND CAUSE OF ACTION
## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
## 5 U.S.C. § 706(2)(A)

100.   The preceding paragraphs are repeated and realleged as if fully set forth herein.

101.   Pursuant to 5 U.S.C. § 706(2)(A), this Court shall hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

102.   The Census Bureau stated in its January 9, 2020 Rule that "[t]he Population Estimates Challenge Program will resume in 2022 after the Census Bureau concludes its responsibilities in the conduct of the decennial census."

103.   The Census Bureau assured local units of government in the January 9, 2020 rule that, after the Population Estimates Challenge Program is restarted in 2022, "[t]he Census Bureau would accept challenges beginning with the 2021 population estimates."

104.   The Census Bureau has completed operations associated with the 2020 decennial census, with apportionment results released on April 26, 2021 and the final redistricting data released to the states on September 16, 2021.

105.   On or before February 2, 2022, the Census Bureau, without providing notice or opportunity for public comment, stated on its website that the Population Estimates Challenge Program "is expected to resume in 2023."

106. This unpromulgated rule purported to supersede, and is in contravention of, the January 9, 2020 Rule stating that the "Population Estimates Challenge Program will resume in 2022 . . . ."

107. The Census Bureau released the 2021 population estimate for the City of Detroit on May 26, 2022.

108. The Census Bureau has admitted that the 2020 Census undercounted the Black and Hispanic population and overcounted the non-Hispanic White population, but that admitted undercount was not corrected in the 2021 population estimate for the City of Detroit.

109. Pursuant to 15 CFR § 90.6(a) a request to challenge a population estimate must be filed within 90 days after the release of the estimate by the Census Bureau.

110. The City's request for the derivation sheet containing the components used to create the population estimate—the necessary first step in challenging the 2021 population estimate—was timely.

111. The Bureau applied its unpromulgated rule by denying the City's request on August 4, 2022.

112. The City has therefore been precluded from challenging the inaccurate 2021 population estimate.

113.   The City of Detroit has been, and will continue to be, harmed by the inaccurate 2021 population estimate.

114.   The Census Bureau's unilateral decision not to resume the Population Estimates Challenge Program in 2022 prevents the City from challenging the inaccurate 2021 population estimate, in contravention of Congress's direction that accurate data be collected to ensure the proper distribution of federal funding to local units of government and the Bureau's policy, as stated in 15 CFR § 90.2, "to provide governmental units the opportunity to seek a review and provide additional data to [population] estimates and to present evidence relating to the accuracy of the estimates."

115.   The Census Bureau's unpromulgated rule continuing the suspension of the Population Estimates Challenge Program into 2023 is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

116.   The Bureau's refusal to consider relevant evidence regarding the population and housing count "base," which drives the annual population estimates, as part of its Population Estimates Challenge Program, constitutes an arbitrary and capricious act that is without a reasonable basis.

117.   The Bureau's refusal to make appropriate adjustments to its population estimate notwithstanding evidence showing an increase in Detroit's population

between April 1, 2020 and July 1, 2021 because of the artificial "county cap" constitutes an arbitrary and capricious act that is without a reasonable basis.

118.   The Bureau's refusal to consider clear and convincing administrative data on all relevant components of population change as part of its Population Estimates Challenge Program—evidence that is directly relevant to its mandate to "annually produce and publish for each State, county, and local unit of general purpose government . . . current data on total population and population characteristics" (13 U.S.C. § 181(a))—constitutes an arbitrary and capricious act that is without a reasonable basis.

119.   Accordingly, this Court should hold unlawful and set aside the Bureau's unpromulgated rule delaying the reinstatement of the Population Estimates Challenge Program until 2023; direct the Bureau to consider evidence regarding the population and housing unit "base" as part of its Population Estimates Challenge Program; direct the Bureau to eliminate the "county cap," which arbitrarily hinders an accurate estimate of the City's population; and direct the Bureau to permit Detroit to challenge all relevant "change components" used in the annual population estimate with reliable administrative data.

## THIRD CAUSE OF ACTION
## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
## 5 U.S.C. § 706(1)

120.    The preceding paragraphs are repeated and realleged as if fully set forth herein.

121.    Pursuant to 5 U.S.C. § 706(1) this Court shall "compel agency action unlawfully withheld or unreasonably delayed."

122.    Pursuant to 13 U.S.C. § 181(a), the Bureau is required, to the extent feasible, to produce reliable population estimates for each local unit of government with a population of fifty thousand or more for every year between each decennial census.

123.    Under 15 CFR § 90.9:

The Chief, Population Division, Census Bureau, or the Chief's designee *shall* review the evidence provided with the request for the population estimate challenge, *shall* work with the governmental unit to verify the data provided by the governmental unit, and evaluate the data to resolve the issues raised by the governmental unit. Thereafter, the Census Bureau *shall* respond in writing with a decision to accept or deny the challenge" (emphasis added).

124.    The Census Bureau's obligation to permit governmental units to challenge population estimates is not discretionary.

125.    The Census Bureau stated in its January 9, 2020 rule that "[t]he Population Estimates Challenge Program will resume in 2022 after the Census Bureau concludes its responsibilities in the conduct of the decennial census."

126.   The Bureau is required by law to resume the Population Estimates Challenge Program in 2022.

127.   This Court should therefore issue an Order compelling the Census Bureau to resume its challenge program by promptly accepting and fairly evaluating challenges to the 2021 population estimates.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF THE FIFTH AMENDMENT'S GUARANTEE OF**
**EQUAL PROTECTION**

128.   The preceding paragraphs are repeated and realleged as if fully set forth herein.

129.   The Fifth Amendment to the United States Constitution requires that the federal government not deny people the equal protection of its laws, and prohibits the federal government from discriminating against persons living in the United States on the basis of race or ethnicity.

130.   By its own admission, the Bureau undercounted the Black population by 3.30% and the Hispanic population by 4.99%, while overcounting the non-Hispanic White population by 1.64%

131.   Notwithstanding this admission, the Bureau refused to correct its racially-biased undercount of Detroit's population in the 2021 annual estimate, and refuses to allow the City to submit evidence challenging the 2021 estimate, thus perpetuating and reinforcing the racial bias that disproportionately harms the people

of Detroit.

132.   On information and belief, certain methodologies employed by the Bureau in calculating its annual estimate of the City's population—including, without limitation, the "housing unit loss" factor, which disproportionately discriminates against predominantly minority communities living in older housing, and the "county cap" rule, under which evidence establishing an increase in Detroit's majority-minority population is necessarily offset by county-level figures related to less racially diverse communities outside of Detroit—have a disparate impact on the City and its Black and Hispanic residents.

133.   Defendants' decisions bear no rational relationship to achieving an accurate estimate of Detroit's population.

134.   Defendants' intentional actions have resulted in actual discrimination against Detroit's Black and Hispanic residents by excluding many of them from the 2021 population estimate, and by failing to afford the City any remedy to correct that undercount.

135.   The result of Defendants' actions is, among other things, a reduction in the levels of federal funding, benefits, and other resources to which the City of Detroit and its Black and Hispanic residents are entitled, along with a reduction in private investment due to the false narrative of population loss.

136.   Black and Hispanic Detroiters have suffered, and will continue to

suffer, discriminatory effects due to the racially-biased undercount reflected in, and reinforced by, the 2021 population estimate.

137.   Those discriminatory effects include a reduction in the amount of federal funds available to Detroiters, and a reduction in private investment in Detroit, a city where Black and Hispanic residents collectively comprise over 84% of the population.

138.   In whole or in part, the federal government uses data from the annual population estimates to allocate billions of dollars of federal funding involving many federal programs, including Medicaid, the Supplemental Nutrition Assistance Program, highway planning and construction, School Lunch Program, Temporary Assistance for Needy Families, Title 1 grants to local education agencies, Head Start, and Community Development Block Grants, and the Census Bureau admits that "businesses use population statistics to help decide where to add jobs or open new stores, offices or other businesses in communities across the country."

139.   Defendants' purposeful actions, reflected in, and reinforced by, the 2021 population estimate of Detroit, are discriminatory and without rational basis, let alone any important or compelling governmental interest.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

1.     Hold unlawful and set aside the Bureau's unpromulgated rule delaying

the reinstatement of the Population Estimates Challenge Program until 2023;

2.    Issue an Order compelling the Census Bureau to promptly accept and fairly evaluate challenges to the 2021 population estimates;

3.    Issue an Order directing the Bureau to consider evidence regarding the population and housing unit "base" as part of its Population Estimates Challenge Program, including with respect to housing vacancy rates and person-per-household figures;

4.    Issue an Order directing the Bureau to eliminate the "county cap" rule;

5.    Issue an Order directing the Bureau to permit Detroit to challenge all relevant "change components" used in the annual population estimate with reliable administrative data;

6.    Declare that Defendants' intentional refusal to correct the racially-biased undercount of Detroit's population in the 2021 annual estimate, and refusal to allow the City to submit evidence challenging the 2021 estimate, negatively and disproportionately affects the count of the City and results in actual discrimination against Detroit's Black and Hispanic residents;

/ / /

/ / /

/ / /

/ / /

7.      Award Plaintiff its reasonable fees, costs, and expenses, including

attorneys' fees, pursuant to 28 U.S.C. § 2412; and

8.      Award such additional relief as the Court deems proper.

Respectfully submitted,

Dated: September 20, 2022          FINK BRESSACK

By: */s/ David H. Fink*
David H. Fink (P28235)
Nathan J. Fink (P75185)
Philip D.W. Miller (P85277)
645 Griswold Street, Suite 1717
Detroit, Michigan 48226
(313) 387-3300

CITY OF DETROIT
LAW DEPARTMENT
Conrad L. Mallett, Jr. (P30806)
Charles N. Raimi (P29746)
Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 500
Detroit, Michigan 48226
(313) 224-4550

*Counsel for Plaintiff*